IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| BRANIMIR CATIPOVIC,<br><br>Plaintiff,<br><br>vs.<br><br>MARK TURLEY, ROLAND FAGEN,<br>and FAGEN, INC.,<br><br>Defendants. | No. C11-3074<br><br>ORDER REGARDING DISCOVERY |

TABLE OF CONTENTS

*I. INTRODUCTION* .................................................. 1

*II. RELEVANT FACTS AND PROCEEDINGS* ........................ 2

*III. DISCUSSION* .................................................. 4
    A.    *Request for Production of Documents* ................... 4
        *1.*    *Financial Statements* ............................. 4
        *2.*    *Tax Returns* ....................................... 7
        *3.*    *Bank Account Statements* ....................... 10
        *4.*    *Loan Documents* ................................. 12
        *5.*    *Communications Between Defendants* ........... 14
    B.    *Deposition of Mark Turley* ............................ 15

*IV. ORDER* ...................................................... 19

*I. INTRODUCTION*

On the 16th day of April 2013, this matter came on for hearing on the Motion to Quash Notice of Deposition and Motion for Protective Order (docket number 41) filed by Defendant Mark Turley on April 5, 2013, and the Amended and Substituted Motion to Compel (docket number 45) filed by Plaintiff Branimir Catipovic on April 11, 2013. The

Plaintiff was represented by his attorneys, Kevin J. Visser and Paul D. Gamez. Defendant Mark Turley was represented by his attorneys, Elizabeth R. Meyer and Michael C. Richards. Defendants Roland Fagen and Fagen, Inc. were represented by their attorney, Dana L. Oxley.

## II. RELEVANT FACTS AND PROCEEDINGS

In his amended complaint, Plaintiff Branimir Catipovic seeks damages against Defendants Mark Turley, Roland Fagen, and Fagen, Inc. for breach of contract (Count I) and unjust enrichment (Count II). According to the complaint, Catipovic was working as a medical doctor at the VA Hospital in Mason City in 2005-2006, and became aware of an ethanol production facility located in the area. Catipovic, who was born in Croatia and resides in Massachusetts, "began to study ethanol production." In July 2006, Catipovic traveled to Croatia with Walter Wendland, CEO of the Golden Grain ethanol plant near Mason City, to determine the viability of producing ethanol in Eastern Europe.

Catipovic asserts that in late fall 2006, he and Wendland traveled to Granite Falls, Minnesota, to offer Fagen "the opportunity to build ethanol plants in Eastern Europe." Fagen, Inc. is a large construction company specializing in ethanol plant construction. To obtain start-up capital for the project, Catipovic traveled to Ireland in April 2007, where he met with Turley, who is an Irish citizen. According to the complaint, Turley traveled to Croatia the following month and met with Catipovic's brother to gain additional information. In June 2007, Turley, Catipovic, and Wendland met in Mason City, Iowa and allegedly "entered into an agreement to build ethanol plants in Eastern Europe, with the first plant to be built in Osijek, Croatia."

Attached to the complaint as Exhibit A is an email from Turley to Wendland, dated July 2, 2007, stating that "I am delighted we were able to come to an agreement which I though [*sic*] was agreed before I went over." Attached to the email is a document which Turley describes as "my understanding." The attachment identifies Catipovic and

2

Wendland as "the Promoters," with Turley and Chris McHugh identified as "the Investors." The agreement refers to the construction of ethanol plants in Croatia and Serbia, with the Investors committing 30 million Euro to provide equity capital. According to the agreement, "[t]he investors will have an 80% interest in both plants with the promoters retaining a 20% interest." The agreement also states that "[t]he main contractor (Fagen Inc) may invest up to 1 million dollars in both plants."

According to the complaint, the parties actively worked toward developing the project. Catipovic and Turley met in Ireland in early February 2008 to "address and negotiate issues that had arisen regarding the Ethanol Europe project." Catipovic asserts in his complaint that on February 15, 2008, after he had left Ireland, "Turley inexplicably and unilaterally refused to move forward with the Agreement and ordered that all work on the shareholders agreement cease." While the proposed plants in Croatia and Serbia were not built, Catipovic asserts that Turley used his work in developing an ethanol plant in Hungary, which began construction in August 2010. The Hungarian plant became operational in April 2012.[1]

On April 23, 2012, Turley filed a motion to dismiss, claiming the court in Iowa lacks personal jurisdiction over him. The Court denied the motion in an Order filed on June 8, 2012. Turley filed an answer to the amended complaint on June 19, and the Fagen defendants filed an answer on June 25.

Meanwhile, on May 15, 2012, the Court adopted a proposed Scheduling Order and Discovery Plan submitted by the parties. Among other things, the parties agreed to a May 10, 2013 deadline for completion of discovery. This matter is set for trial before Judge Mark W. Bennett on October 28, 2013.

---

[1] Catipovic's allegations are described in greater detail in the Court's Memorandum Opinion and Order Regarding Defendants' Motion to Dismiss (docket number 25).

## III. DISCUSSION

On August 22, 2012, Catipovic served each of the defendants with interrogatories and a request for production of documents. Turley responded to Catipovic's discovery requests on November 20. Defendants Fagen served their responses to the discovery requests on December 4. Defendants objected to the request for production of certain documents seeking financial information. In his amended motion to compel, Catipovic identifies five disputed requests for production. Specifically, the parties cannot agree on Catipovic's requests for production of documents numbers 14, 15, 16, 19, and 25.[2]

In addition, Catipovic asks that the Court order Turley, who has resided in Hungary since November 2010, to travel to the Northern District of Iowa and submit to a deposition. In his motion to quash, Turley asks that the Court quash the Notice of Deposition, setting Turley's deposition for May 6, 2013 at the office of Catipovic's counsel in Cedar Rapids. The Court will address these disputes in order.

### A. Request for Production of Documents

#### 1. Financial Statements

In Request for Production of Documents No. 14, Catipovic asks that Turley and Fagen produce their "personal financial statements from January 1, 2007 to the present," and that Fagen, Inc. produce its financial statements for the same time period. Turley objected to the request "as irrelevant to the subject matter of the claim or defense of any party and not reasonably calculated to lead to the discovery of admissible evidence." The Fagen defendants objected, asserting the requested documents are "immaterial and irrelevant information not reasonably calculated to lead to the discovery of the material or admissible evidence," and asserting further that the financial statements are "completely irrelevant to the issues involved in this action."

---

[2] In the request for production of documents directed to Fagen, Inc., the last disputed document request is numbered 24.

4

The familiar standard governing the scope of discovery generally is found in FEDERAL RULE OF CIVIL PROCEDURE 26(b)(1): "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Accordingly, the Court must determine whether the personal financial statements of Turley and Fagen, and the corporate financial statement of Fagen, Inc., are relevant to Catipovic's claims. In a discovery context, relevancy "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). *See also Davis v. Union Pacific R.R. Co.*, 2008 WL 3992761 (E.D. Ark.) at *2 ("a request for discovery should be considered relevant if there is 'any possibility' that the information sought may be relevant to the claim or defense of any party"); *Moses v. Halstead*, 236 F.R.D. 667, 671 (D. Kan. 2006) (same).

Turley is purportedly a wealthy businessman with varied financial interests. Fagen, Inc. is a large construction company, with between 600 and 3,000 employees at any given time. Defendant Roland Fagen is apparently a principal with Fagen, Inc. It can be reasonably inferred that the "personal financial statements" of Turley and Fagen may be substantial and complex, and largely unrelated to the claims made here. Similarly, Fagen, Inc.'s financial statements dating back to 2007 may be voluminous, and unrelated to this controversy.

At the time of hearing, Catipovic's counsel argued that the information is necessary to determine Catipovic's damages. That is, while the ethanol plants in Croatia and Serbia were not built, Catipovic asserts he is entitled to a 10% interest in the Hungarian plant. According to Mr. Gamez, "what we don't know, and what hasn't been produced to us in this case, is the financial results of this project as it's gone forward." In response to questioning by the Court, Mr. Gamez conceded that Catipovic is "not looking to discover information about other unrelated businesses" that Turley or the Fagen defendants may be

5

invested in. That is, Mr. Gamez agreed that the production of financial statements could be limited to those portions pertaining to any ethanol projects in Europe.

In response, Turley's counsel advised the Court that Turley is now willing to produce an audited financial statement for the Hungarian facility. The plant became operational in April 2012 and, while he was uncertain, Mr. Richards believed the financial statement runs through the end of the calendar year. In his resistance to Catipovic's motion to compel, Turley states that "audited 2012 financials relating to the Hungarian Facility are expected to be prepared by the end of this month, and that Turley intends to produce such financials to Plaintiff as soon as they are available."[3] At this point, it is unknown whether the financial statement of the Hungarian facility will provide all of the information sought by Catipovic.

"Discovery Rules are to be broadly and liberally construed in order to fulfill discovery's purposes of providing both parties with 'information essential to the proper litigation of all relevant facts, to eliminate surprise, and to promote settlement.'" *Rollscreen Co. v. Pella Products*, 145 F.R.D. 92, 94 (S.D. Iowa 1992). While the standard to be applied is one of liberality, however, "relevancy under Rule 26 is not without bounds." *Bredemus v. International Paper Co.*, 252 F.R.D. 529, 533 (D. Minn. 2008). *See also Oppenheimer Fund*, 437 U.S. at 351 ("At the same time, 'discovery, like all matters of procedure, has ultimate and necessary boundaries.'") (quoting *Hickman v. Taylor*, 329 U.S. 495, 507 (1947)).

Generally, the party resisting production of the requested information bears the burden of establishing lack of relevancy. *St. Paul Reinsurance Co., Ltd. v. Commercial Financial Corp.*, 198 F.R.D. 508, 511 (N.D. Iowa 2000).

> The party must demonstrate to the court "that the requested documents either do not come within the broad scope of

---

[3] Turley's Resistance to Motion to Compel (docket number 49) at 3-4, ¶ 13.

6

> relevance defined pursuant to FED. R. CIV. P. 26(b)(1) or else are of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure.

*Id.* (quoting *Burke v. New York City Police Department*, 115 F.R.D. 220, 224 (S.D.N.Y. 1987)). "However, when a request for discovery is overly broad on its face or when relevancy is not readily apparent, the party seeking the discovery has the burden to show the relevancy of the request." *Cunningham v. Standard Fire Ins. Co.*, 2008 WL 2902621 (D. Colo.) at *1.

The Court concludes that the personal financial statements of Turley and Fagen dating back to 2007, and the corporate financial statement of Fagen, Inc. during the same time frame, are generally irrelevant to the issues in this case. To the extent the financial statements refer to Turley's or the Fagen defendants' interests in ethanol production in Eastern Europe, however, then they may bear on, or reasonably could lead to other matter that could bear on, an issue in this case. *Oppenheimer Fund*, 437 U.S. at 351. Therefore, Defendants are required to produce only that portion of their financial statements which references an interest in ethanol plants in Eastern Europe.

### 2. Tax Returns

In Request for Production of Documents No. 15, Catipovic asks that Defendants produce their "tax returns from 2007 to the present." At the time of hearing, Catipovic's attorney advised the Court that Catipovic was seeking Defendants' tax returns for the same reasons that he was seeking financial statements. That is, Mr. Gamez seeks to determine if there have been "profits that have flowed through these tax returns, so we can identify what our client's stake in that would be for the purpose of calculating damages." Defendants object to the production of tax returns, arguing that they are irrelevant.

Turley's counsel noted at the hearing that Request for Production No. 13 asks Defendants to produce any documents "evidencing any monetary distributions" received

7

in connection with the production of ethanol in Hungary or other locations in Europe. After objecting on relevancy grounds, Turley responded that "no such documents exist." Counsel also represented to the Court that "no profits have been taken," noting that the plant did not become operational until April 2012. Finally, Turley asserts that the information sought by Catipovic will likely be included in the audited financial statement which is forthcoming shortly.

There is some split of authority regarding the standard to be applied in determining the discoverability of tax returns. The two views were succinctly stated by the Court in *Terwilliger v. York Intern. Corp.* as follows:

> Courts have made it increasingly clear that tax returns in the hands of a taxpayer are not privileged from civil discovery. Nevertheless, judicial consensus exists that, as a matter of policy, great caution should be exercised in ordering the disclosure of tax returns. Unnecessary disclosure of tax returns is to be avoided.
>
> Examination of case law reveals the emergence of a judicially developed "qualified privilege ... that disfavors the disclosure of income tax returns as a matter of general federal policy." A two-prong test has been utilized to assess whether the qualified privilege should be overcome and a party's income tax returns should be disclosed. The court must determine whether (1) the tax return is relevant to the subject matter in dispute; and (2) a compelling need exists for the return, because the information sought is not obtainable from other sources. While the party seeking discovery of the tax returns bears the burden of establishing its relevance, the resisting party has the task to identify an alternative source for the information.
>
> In contrast, a minority of courts have held that the sole inquiry governing discovery of tax returns is whether the information contained in the return is relevant.

176 F.R.D. 214, 216-17 (W.D. Va. 1997) (all citations omitted).

While the Eighth Circuit Court of Appeals has not addressed this issue, it appears that most district courts in the Eighth Circuit have adopted the two-prong test described in *Terwilliger*. *See, e.g., E-P Intern. Distribution, Inc. v. A & A Drug Co.*, 2009 WL 1442534 (D. Neb. 2009) (observing that "many courts require a heightened showing of relevance and necessity before ordering the disclosure" of tax returns, and that "[w]hen applying this standard, most courts use a burden-shifting test"); *Sowers v. Gatehouse Media Missouri Holdings, Inc.*, 2009 WL 1106946 (E.D. Mo. 2009) (noting that "most courts apply a two-part test"); *EEOC v. Ceridian Corp.*, 610 F. Supp. 2d 995, 997 (D. Minn. 2008) (finding that "a preponderance of authorities set out a two-part standard for deciding whether tax returns should be disclosed").

Accordingly, the Court will apply the two-prong test in determining whether Defendants are required to produce their tax returns. Under the first prong of the test, Catipovic has the initial burden to show that the tax returns are relevant. If so, the second prong of the test is whether there is a compelling need for the returns. "When looking at whether there is a compelling need, a court examines whether the information in the returns is readily obtainable from another source." *Ceridian*, 610 F. Supp. 2d at 997. Defendants bear the burden of proof on the second prong of the test.

On the initial question of whether the tax returns are relevant to any issue in this case, the analysis follows closely that set forth above regarding financial statements. That is, the Court suspects the tax returns of Turley, Fagen, and Fagen, Inc. may be substantial and complex. The Court also suspects they are largely irrelevant to any issue in this case. Their relevancy, if any, is limited to the extent they may refer to ethanol projects in Eastern Europe.

Even if the tax returns are marginally relevant, however, the Court concludes that Defendants have met their burden of showing that the information is readily obtainable from another source. That is, Turley has agreed to produce an audited financial statement

9

for the Hungarian ethanol plant. In addition, the Court has ordered Defendants to produce that portion of their financial statements, if any, which refers to ethanol production in Eastern Europe. As a general rule, Courts do not favor compelling production of tax returns. *Johnson v. Kraft Foods North America, Inc.*, 236 F.R.D. 535, 539 (D. Kan. 2006). The heightened discovery standard found in the two-prong test is intended "to assure a balance between the liberal scope of discovery and the policy favoring the confidentiality of tax returns." *Id.* In balancing those interests here, the Court concludes Defendants are not required to produce copies of their tax returns from 2007 to the present.

### 3. Bank Account Statements

In Request for Production of Documents No. 16, Catipovic asks for all bank statements "into which or out of which any capital, cash, investments or loan proceeds flowed in connection with the European Ethanol Venture and/or your involvement in the production of ethanol or the building of an ethanol plant(s) in Hungary or other locations in Europe."[4] Defendants object on general relevancy grounds, and the Fagen defendants assert that the requested information is "confidential and proprietary."

The Fagen defendants emphasize that their bank statements are not relevant to Catipovic's claim of unjust enrichment — the only claim made against the Fagen defendants. In his brief, Catipovic recognizes that "[d]amages under a claim of unjust

---

[4] A strict reading of request no. 16 suggests that it seeks *all* account statements in any bank where Defendants had an account used in connection with the development of ethanol plants in Eastern Europe. That is, if Turley had ten accounts at a bank and one of those accounts was used for these purposes, then a strict reading of the request would require production of all ten account statements. At the time of hearing, however, Catipovic's counsel made it clear that Catipovic is seeking statements for only those accounts which were actually used for this purpose.

10

enrichment are measured by the value of what was inequitably retained."[5] That is, damages depend on the value of services provided, not the defendant's profitability. *Iowa Waste Sys., Inc. v. Buchanan County*, 617 N.W.2d 23, 30 (Iowa App. 2000). Here, Fagen, Inc. was contracted to build the ethanol facility in Hungary. It is the Court's understanding that the cost was approximately $118 million. Presumably, Fagen, Inc. had a number of accounts "into which or out of which" money flowed in connection with the construction of the facility. Nonetheless, the Court concludes that those bank statements — which are presumably voluminous — are not relevant to any claim against Fagen, Inc. or Roland Fagen.

The same analysis holds true regarding the unjust enrichment claim made against Turley. In his breach of contract count against Turley, however, Catipovic claims that he is entitled to 10% of the value of the Eastern European ethanol venture, including the plant in Hungary. At the hearing, Turley's counsel argued that the request for all bank statements regarding this project is overly broad and unduly burdensome. Ms. Meyer noted that Turley intends to produce the "Closing Binder" prepared in connection with obtaining financing for the Hungarian facility.[6] In addition, it should be recalled that Turley intends to produce an audited financial statement for the Hungarian facility. Ms. Meyer argued that "it would be much more appropriate to revisit the production of additional personal bank statements" after Catipovic has received the Closing Binder and the audited financial statement.

---

[5] Catipovic's Amended and Substituted Brief (docket number 45-1) at 12 (citing *Western Reserve Life Assur. Co. of Ohio v. Bratton*, 464 F. Supp. 2d 814, 844 (N.D. Iowa 2006)).

[6] In his brief, Turley asserts that the Closing Binder "contains 6,882 pages of documents relating to the Hungarian facility, including a full copy of the 157 page financial model developed for the Hungarian Facility." Turley's Brief in Resistance (docket number 49-1) at 8.

11

Catipovic's stated purpose in obtaining the bank statements is to determine the value of the Eastern European ethanol venture. The Court concludes that bank statements merely showing money "flowing in and flowing out" regarding this project have limited relevance. In addition, they may be voluminous. The Court will withhold final ruling on the production of the bank statements until after Turley has produced the Closing Binder and the audited financial statement. If Catipovic still believes that the bank statements must be produced at that time, then he may renew his motion to compel. Defendants are not required to produce copies of their bank statements at this time.

### 4.   Loan Documents

In Request for Production of Documents No. 19, Catipovic asks for all documents provided to any bank which provided financing, or was approached to provide financing, for any ethanol production project in Europe, whether or not the project currently exists, "including but not limited to business plans, pro-forma projections, balance sheets, income statements and cash flow statements." In his response, Turley objected to the scope of the request, but then stated that "responsive documents are produced." The Fagen defendants objected to the scope of the request, asserted the request was overly broad and burdensome "to the extent the request is not limited in time," and claimed that terms in the request were vague and overbroad. Nonetheless, the Fagen defendants stated that their response to the request "is contained in the Summation load file being provided concurrently with these responses."

Presumably, the "Closing Binder" being produced by Turley will provide the requested information regarding the Hungarian facility. According to Turley's counsel, this was a 200 million Euro project, which required a "very thorough exhaustive analysis," and included "every document the lenders felt was relevant in order to support their financing of this project." The Closing Binder approaches 7,000 pages of documents and apparently includes a 157-page financial model developed for the Hungarian facility.

12

At the time of hearing, Catipovic's attorney acknowledged that the Closing Binder may contain the requested information regarding the Hungarian facility. According to Mr. Gamez, however, "it would provide probably the least important information." That is, Catipovic claims that after Turley severed his relationship with Catipovic in February 2008, Defendants used the work provided by Catipovic and Wendland in further pursuing opportunities in Croatia and, later, Hungary. According to Mr. Gamez, Catipovic "developed financial models and calculations as to how a facility like this would be profitable." Catipovic believes his plans were then used by Defendants to pursue prospective lenders. According to Mr. Gamez, "those may not have been the ultimate folks that underwrote this investment, but our claim is that our information was used to take this project; and so this is a very important request by our client to be able to discover what did you give to — not just the lender that ultimately financed this — but prospective lenders." In response, Turley's counsel argued that information provided to prospective lenders for any project, other than the Hungarian facility, would be irrelevant because those projects did not go forward, "so essentially there would be no damage associated with that."

As the Court understands it, Catipovic's request for information submitted to lenders for projects other than the Hungarian facility is not related to the issue of damages, but is rather related to the issue of liability. In reviewing the Closing Binder for the Hungarian facility, the parties will be able to determine how much of Catipovic's work, if any, was submitted by Turley to obtain financing. However, a review of documents submitted on earlier occasions to different lenders may provide additional insight or perspective to the information submitted for the Hungarian project. In other words, it may show how Catipovic's original analysis evolved into the information submitted by Turley in support of the Hungarian facility. In the discovery context, relevancy "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to

13

other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund*, 437 U.S. at 351. *See also Rollscreen Co.*, 145 F.R.D. at 94 (discovery rules are to be "broadly and liberally construed"). Applying this liberal standard, the Court concludes that Defendants are required to produce documents submitted to any lender, or prospective lender, that was approached regarding financing of any ethanol production project in Europe, whether or not financing was obtained or the project went forward.[7]

### 5. *Communications Between Defendants*

In Request for Production of Documents No. 25, Catipovic asks for all communications between Defendants "regarding plans, negotiations and/or any agreements to work together to produce ethanol or build any ethanol plants in Europe."[8] At the time of hearing, it was determined that this issue was largely undisputed. Defendants objected to the request to the extent that it was seeking "operational" communications between the parties. Obviously, in the construction of a $118 million facility, there would be thousands of emails regarding the construction and operation of the facility.

At the time of hearing, however, Catipovic's attorney made it clear that he was seeking "communication that these defendants had with each other for the purpose of discussing the production of ethanol in Europe." That is, as stated in the request, Catipovic seeks those communications "regarding plans, negotiations and/or any agreements to work together to produce ethanol or build any ethanol plants in Europe." Defendants' counsel advised the Court that all communications responsive to that request have been produced. If Defendants have *not* produced copies of communications between

---

[7] As noted initially, Defendants claim in their responses that responsive documents have been produced.

[8] In the Request for Production of Documents submitted to Fagen, Inc., the request is identified as number 24.

14

them regarding planning, negotiation, or agreements to work together to produce ethanol in Eastern Europe, then they must do so at this time.

### B. Deposition of Mark Turley

Catipovic has noticed Turley's deposition for May 6, 2013 at the office of Catipovic's attorneys in Cedar Rapids, Iowa. In his motion, Turley asks that the notice of deposition be quashed and a protective order entered, requiring Turley's deposition be conducted in Budapest, Hungary, where he resides. Alternatively, Turley suggests that he "make himself available on a date mutually agreeable to the parties for a videoconference deposition."[9] In his resistance, Catipovic states that "in the spirit of compromise, Plaintiff agrees to pay Defendant Turley's reasonable airfare and lodging costs associated with traveling to Iowa for the deposition, so long as those costs are subject to taxation if Plaintiff prevails in this matter."[10]

A party seeking to take a deposition must give reasonable written notice to other parties, identifying the deponent and stating the time and place of the deposition. FED. R. CIV. P. 30(b)(1). Generally, "the deposition of a non-resident defendant should be conducted at the defendant's place of residence." *Steppe v. Cleverdon*, 2007 WL 6831006 (E.D. Ky.), *2. *See also Federal Deposit Ins. Co. v. La Antillana S.A.*, 1990 WL 155727 (S.D.N.Y.), *1 ("Ordinarily, the proper place for taking an individual's deposition is his or her place of residence."); *Mill-Run Tours, Inc. v. Khashoggi*, 124 F.R.D. 547, 550 (S.D.N.Y. 1989) (same). This general rule places the burden on Catipovic to justify taking the deposition in Cedar Rapids.

> If a plaintiff notices an individual defendant's deposition with a location other than defendant's residence or place of business and defendant makes an objection, the plaintiff has the

---

[9] Motion to Quash (docket number 41) at 4, ¶ 14.

[10] Catipovic's Resistance (docket number 50) at 6.

> affirmative burden of demonstrating "peculiar" circumstances which compel the court to suspend the general rule and to order that depositions be held in the other location.

*Federal Deposit Ins. Co.*, 1990 WL 155727 at *1. *See also Steppe*, 2007 WL 6831006 at *2 ("[W]hen a defendant objects to a deposition being taken at a place other than his place of residence, the objection should be sustained, unless there are unusual circumstances which justify such an inconvenience to the defendant.").

When the parties are unable to agree, courts have broad discretion in selecting the place for a deposition. *New Medium Technologies LLC v. Barco N.V.*, 242 F.R.D. 460, 466 (N.D. Ill. 2007). In determining whether a deposition should be taken locally or abroad, the Court considers a variety of factors.

> These factors include: (1) the burden to the parties of holding the depositions in the United States relative to the burden of holding the depositions abroad, including the burdens imposed on the witnesses and the parties' counsel; (2) the court's ability to supervise depositions in the contested location; (3) whether depositions would be impeded by any legal or procedural barriers in another nation; and (4) the potential affront to the sovereignty of a foreign nation if a deposition pursuant to the FEDERAL RULE OF CIVIL PROCEDURE is held within its borders.

*In re: Vitamin Antitrust Litigation*, 2001 WL 35814436 (D.D.C.), *4.

Regarding the first factor, taking the deposition in Iowa places a substantial burden on Turley. According to his brief, Turley resides in Budapest, Hungary, which is 4,953 miles from Cedar Rapids, Iowa. Catipovic asserts in his resistance that Turley was in the United States for business at least twice within the last ten months, once in Minneapolis (late 2012) and once in Las Vegas (2013). In response to a request by the Court, however, Turley's counsel reported following the hearing that Turley does not have any travel planned to the United States "in the immediate future, including April or May 2013." According to his brief, Turley has only visited Iowa twice, with the last visit in 2008.

16

While requiring Turley to travel to the United States for a deposition places a substantial burden on him, making counsel travel to Hungary for a deposition is equally burdensome. Because the case is factually complex, it would be necessary for one or more of Catipovic's attorneys to travel for the deposition. That is, hiring "local counsel" in Hungary to conduct the deposition is not a viable alternative. Neither party provided details regarding the logistics of traveling to and from Hungary, but the Court assumes that it would require at least a full day. Accordingly, if Turley travels to Iowa, or if counsel travel to Hungary, the time and expense associated with taking the deposition is substantial.

The second factor described in *Vitamin Antitrust* is "the court's ability to supervise depositions in the contested location." Turley's brief asserts that Hungary and Iowa are separated by seven time zones. That is, if a deposition starts at 9:00 a.m. in Budapest, it is 2:00 a.m. in Cedar Rapids. This time difference, together with the distance, would make it difficult for the Court to resolve any disputes which may arise during the course of the deposition. *See New Medium Technologies*, 242 F.R.D. at 467 (recognizing that the Court's ability to intervene should problems arise is compromised when the deposition is taken many time zones away); *Custom Form Mfg., Inc. v. Omron Corp.*, 196 F.R.D. 333, 336 (N.D. Ind. 2000) (same).

A third factor to be considered by the Court is whether there would be any "legal or procedural barriers" in conducting the deposition in Hungary. Logistically, it would be necessary for the parties to locate a court reporter in Budapest, who is proficient in English. Neither party was able to advise the Court at the hearing regarding the relative ease or difficulty in finding such a reporter. Catipovic also suggests in his resistance that the deposition "may be significantly delayed or obstructed by the legal and procedural requirements" of complying with the Hague Convention on the Taking of Evidence

17

Abroad.[11] At the time of hearing, however, Turley's counsel suggested that strict compliance with the Hague Convention is only necessary when the parties are otherwise unable to agree.

While there is a general presumption that a defendant's deposition will be held where he resides, in some cases the presumption "has little force." "Because courts retain substantial discretion to designate the site of a deposition, the presumption appears to be merely a decision rule that facilitates determination when other relevant factors do not favor one side over the other." *Mill-Run Tours*, 124 F.R.D. at 550. "It is within the discretion of the Court to designate the location for a taking of depositions, and each application must be considered on its own facts and equities." *Farquhar v. Shelden*, 116 F.R.D. 70, 72 (E.D. Mich. 1987).

For the reasons set forth above, the Court concludes that it would be a substantial burden on Catipovic and his attorneys to have the deposition taken in Hungary. For the same reasons, however, it would be a substantial burden on Turley to travel to Iowa for a deposition, even if the costs associated with the travel are advanced by Catipovic.[12] Instead, the Court adopts the alternative suggested by Turley. According to his attorney, Turley has access to "sophisticated videoconferencing technology." Catipovic resists having the deposition conducted by videoconference, asserting it "would be unmanageable given the amount of potential exhibits."[13] The Court believes, however, that this hurdle is relatively easily overcome. Obviously, the relevant documents can be emailed, faxed, or sent to Hungary by a parcel service. Catipovic can then retain "local counsel" or some

---

[11] Catipovic's Resistance (docket number 50) at 4.

[12] In a post-hearing email, Turley's counsel advised the Court that the cost of flying from Hungary to the United States in business class would be approximately €3,500. At current rates, €3,500 is approximately $4,566.

[13] Catipovic's Resistance (docket number 50) at 5.
18

Abroad.[11] At the time of hearing, however, Turley's counsel suggested that strict compliance with the Hague Convention is only necessary when the parties are otherwise unable to agree.

While there is a general presumption that a defendant's deposition will be held where he resides, in some cases the presumption "has little force." "Because courts retain substantial discretion to designate the site of a deposition, the presumption appears to be merely a decision rule that facilitates determination when other relevant factors do not favor one side over the other." *Mill-Run Tours*, 124 F.R.D. at 550. "It is within the discretion of the Court to designate the location for a taking of depositions, and each application must be considered on its own facts and equities." *Farquhar v. Shelden*, 116 F.R.D. 70, 72 (E.D. Mich. 1987).

For the reasons set forth above, the Court concludes that it would be a substantial burden on Catipovic and his attorneys to have the deposition taken in Hungary. For the same reasons, however, it would be a substantial burden on Turley to travel to Iowa for a deposition, even if the costs associated with the travel are advanced by Catipovic.[12] Instead, the Court adopts the alternative suggested by Turley. According to his attorney, Turley has access to "sophisticated videoconferencing technology." Catipovic resists having the deposition conducted by videoconference, asserting it "would be unmanageable given the amount of potential exhibits."[13] The Court believes, however, that this hurdle is relatively easily overcome. Obviously, the relevant documents can be emailed, faxed, or sent to Hungary by a parcel service. Catipovic can then retain "local counsel" or some

---

[11] Catipovic's Resistance (docket number 50) at 4.

[12] In a post-hearing email, Turley's counsel advised the Court that the cost of flying from Hungary to the United States in business class would be approximately €3,500. At current rates, €3,500 is approximately $4,566.

[13] Catipovic's Resistance (docket number 50) at 5.

other qualified person in Budapest to place the relevant document in front of Turley as he testifies.[14]

The FEDERAL RULES OF CIVIL PROCEDURE "should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding." FED. R. CIV. P. 1. After considering all of the facts and circumstances, the Court believes that a deposition conducted by videoconference will accomplish this goal. Turley's motion to quash will be granted. The parties are instructed to cooperate in scheduling Turley's deposition by videoconference. If the parties are unable to agree on a date and time, then either party may make further application to the Court.

## IV. ORDER

IT IS THEREFORE ORDERED as follows:

1. The Amended and Substituted Motion to Compel (docket number 45) filed by Plaintiff Branimir Catipovic is **GRANTED in part** and **DENIED in part** as follows:

    a. Defendants are required to produce only that portion of their financial statements which references an interest in ethanol plants in Eastern Europe.

    b. Defendants are not required to produce copies of their tax returns from 2007 to the present.

    c. Defendants are not required to produce copies of their bank statements at this time.

    d. Defendants are required to produce documents submitted to any lender, or prospective lender, that was approached regarding financing of any ethanol production project in Europe, whether or not financing was obtained or the project went forward.

---

[14] The Court assumes that the documents are all Bates stamped and, therefore, easily identified.

e. If Defendants have *not* produced copies of communications between them regarding planning, negotiation, or agreements to work together to produce ethanol in Eastern Europe, then they must do so at this time.

2. The Motion to Quash and for Protective Order (docket number 41) filed by Defendant Mark Turley is **GRANTED in part** and **DENIED in part** as follows:

a. The notice of deposition requiring Turley to appear for his deposition in Cedar Rapids on May 6, 2013 is **QUASHED**.

b. The parties are instructed to cooperate in scheduling Turley's deposition by videoconference. If the parties are unable to agree on a date and time, then either party may make further application to the Court.

DATED this 19th day of April, 2013.

_____
JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA