IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| BRANIMIR CATIPOVIC | ) | CIVIL NO.  C11-3074 MWB |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **BRIEF IN SUPPORT OF DEFENDANT** |
| | ) | **MARK TURLEY'S MOTIONS IN** |
| | ) | **LIMINE** |
| MARK TURLEY, ROLAND FAGEN, and | ) | |
| FAGEN, INC. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ...........................................................................................................1

FIRST MOTION IN LIMINE – THE OPINIONS OF MICHAEL OTT ...........................2

      A.     Ott's Report is Based on Speculative Data and Flawed Assumptions.........2

      B.     Federal Courts Have Broad Discretion in Determining the Admissibility
           of Expert Witnesses ......................................................................................8

      C.     Ott Lacks the Qualifications or Experience to Necessarily Provide
           Testimony in this Case.............................................................................10

      D.     Ott's Opinions Regarding the Value of Catipovic's Alleged 10 Percent
           Interest in the Dunafoldvar Ethanol Facility Fail to Meet the
           Requirements of Rule 702 .......................................................................12

      E.     Ott's Opinions Regarding Catipovic's Unjust Enrichment Damages
           Fail to Meet the Requirements of Rule 702 ..............................................16

      F.     Ott's Testimony Must be Limited to the Opinions Contained in
           his Report ................................................................................................16

SECOND MOTION IN LIMINE – SPECULATIVE LOST PROFITS DAMAGES.......18

THIRD MOTION IN LIMINE – EVIDENCE RELATED TO FERGUS MURPHY'S
TRAVEL RESTRICTIONS................................................................................20

FOURTH MOTION IN LIMINE – ANY REFERENCE TO UNPLEADED CLAIMS
REGARDING ALLEGED FRAUD OR ALLEGED CONSPIRACY WITH
FAGEN DEFENDANTS ...................................................................................21

FIFTH MOTION IN LIMINE – EVIDENCE OF DAMAGES NOT INCLUDED
IN PLAINTIFF'S ANSWERS TO INTERROGATORIES ...............................................22

SIXTH MOTION IN LIMINE – RELATIVE WEALTH OF THE PARTIES .................24

SEVENTH MOTION IN LIMINE – SETTLEMENT NEGOTIATIONS AND
OFFERS TO COMPROMISE ............................................................................25

EIGHTH MOTION IN LIMINE – IRRELEVANT CORRESPONDENCE TO
WALT WENDLAND.......................................................................................25

CONCLUSION................................................................................27

COMES NOW Defendant Mark Turley and for his Brief in Support of his Motions in Limine states to the Court as follows:

__INTRODUCTION__

Plaintiff's Amended Complaint seeks damages for breach of contract and unjust enrichment.  See Document No. 11.  Plaintiff Branimir Catipovic (hereinafter "Catipovic") alleged in his deposition that Defendant Mark Turley (hereinafter "Turley") promised Catipovic a ten percent ownership interest in any ethanol facility Turley ever built in Europe.[1]  There is no written contact supporting this claim and Turley denies ever promising Catipovic any interest in any future ethanol facilities built by Turley.  Years after Catipovic and Turley terminated their business relationship, Turley and Defendants Ron Fagen and Fagen, Inc. (hereinafter collectively referred to as "Fagen") opened an ethanol facility in Dunafoldvar, Hungary (hereinafter the "Dunafoldvar Ethanol Facility").  The Dunafoldvar Ethanol Facility cost over $200 million to build and did not become operational until April 2012.

As this lawsuit has developed, Catipovic has claimed that he is entitled to damages equal to a ten percent ownership interest in the Dunafoldvar Ethanol Facility.  Additionally, Catipovic claims he is entitled to damages based on a theory of unjust enrichment.  Catipovic has designated Michael Ott (hereinafter "Ott") to provide expert testimony regarding Catipovic's damages.  Catipovic submitted a written "preliminary report" from Ott on February 25, 2013.  A copy of Ott's written report and CV is attached hereto as Exhibit A and incorporated herein by this reference (hereinafter "Report").  Though Catipovic's discovery answers said that Ott's report would be supplemented, it never was.

---

[1] As set forth herein, Catipovic's Amended Complaint does not reference any such promise or agreement between the parties.  See Turley's Fourth Motion in Limine infra.

1

As set forth herein, Turley's Motion in Limine seeks to exclude: (1) Ott's testimony because his damages calculations fail to meet the requirements of <u>Daubert</u> and Federal Rule of Evidence 702; (2) any speculative evidence or testimony regarding future lost profits; (3) any evidence or testimony regarding witness Fergus Murphy's travel restrictions; (4) any reference to unpleaded claims regarding alleged fraud or alleged conspiracy of Defendant Turley with the Fagen Defendants; (5) any evidence of damages not disclosed by Catipovic in his answers to interrogatories; (6) any evidence regarding the relative wealth of the parties; (7) any evidence of pre-trial settlement discussions; and (8) any evidence regarding correspondence between Walt Wendland and Mark Turley dated October 24, 2012.

<u>**FIRST MOTION IN LIMINE**</u>

<u>**THE OPINIONS OF MICHAEL OTT**</u>

**A.** **Ott's Report is Based on Speculative Data and Flawed Assumptions.**

Catipovic alleges he is entitled to damages equal to a ten percent ownership interest in the Dunafoldvar Ethanol Facility. Additionally, Catipovic alleges he is entitled to damages based on unjust enrichment for his services, which purportedly include "the original idea to build ethanol plants" in Eastern Europe and introducing Catipovic to the ethanol industry. Ott has offered opinions regarding the value of Catipovic's damages claims.

As set forth herein, Turley seeks to exclude Ott's testimony because his damages calculations fail to meet the requirements of <u>Daubert</u> and Rule 702. In addition, to the extent Catipovic may attempt to expand the opinions of Ott beyond the opinions contained in Ott's February 19, 2013 written expert report, Turley seeks an order in limine preventing such untimely opinions.

2

On December 10, 2012, Catipovic designated Ott as an expert to testify regarding Catipovic's economic damages. On February 25, 2013, Plaintiff provided his Report. Ott's CV and Report reveal that he is not an economist, CPA, accountant or otherwise trained in financing, economics or business valuation. Rather, Ott has a master's degree in bioinorganic chemistry and a bachelor's degree in chemistry. (See Ex. A) Ott's CV does not specify any publications he has authored or speeches he has made regarding business valuation. As set forth herein, Ott's generalized experience in biotechnology does not qualify him as an expert under <u>Daubert</u>.

To the extent this Court finds Ott generally qualified to offer expert opinions, Ott's specific opinions are not supported by sufficient facts or data as required by <u>Daubert</u> and Rule 702 to be admissible. Ott's Report, which summarizes his calculation of the value of Plaintiff's interest in the Dunafoldvar Ethanol Facility, relies on data from the Center for Agricultural and Rural Development ("CARD") at Iowa State University. As Ott notes in his report: "CARD tracks ethanol returns over operation costs based on an updated dry-mill production technique for a **representative Iowa** corn ethanol plant." (Ex A, p. 3) (emphasis added). Ott further states that: "Given futures prices for the nearby contracts for ethanol and corn from the Chicago Board of Trade and for natural gas from the New York Mercantile Exchange, CARD has computed the ethanol operating returns from March 21, 2005 to the present day." (Ex. A, p. 3) The Ott Report explains that CARD uses "USDA's Livestock and Grain Market News prices paid for corn by ethanol plants as recorded by the Agricultural Marketing Resource Center to calculate basis." (Id.) Integral to the calculation derived in the CARD data, is an operating costs of $0.35 per gallon of ethanol. (Id.) Based on the CARD data, Ott extrapolates what he believes to be the profitability of the Hungarian plant.

Ott's analysis is deeply flawed and rife with obvious errors in logic. None of the CARD data is relevant to Hungary or based on European costs, including input, infrastructure or operating cost information. By its very definition, CARD data only tracks "representative Iowa corn ethanol plants." Ott admits that the data is based on corn prices from the *Chicago Board of Trade* and on natural gas prices from the *New York Mercantile Exchange* – neither of which are applicable to a European ethanol facility. In fact, a review of Iowa State University's CARD's information on its website shows that the natural gas prices used by CARD for its analysis are actually even *more distinctly Iowan* than Ott admits, explaining that the natural gas prices are based on the average costs for Iowa industrial users:

> The natural gas price is taken from the nearby futures contract on New York Mercantile Exchange plus basis calculated from the average price paid for natural gas **by industrial users In Iowa** as reported by the US Energy Information Agency.

See http://www.card.iastate.edu/research/bio/tools/hist_eth_gm.aspx, attached as Exhibit B. (emphasis supplied). There is literally no support for the suggestion that operating costs, gas prices, grain prices and other infrastructure costs for a Hungarian plant would be the same as a "representative Iowa corn ethanol plant."

Furthermore, Ott's reliance on the CARD data to support his speculative opinions regarding the Dunafoldvar Ethanol Facility's profitability is not supportable, even by CARD standards. In particular, Ott states in his report that "data derived from the Center for Agricultural and Rural Development (CARD) at Iowa State University can be used to project ethanol plant profitability." CARD data only measures operating margins for an Iowa plant, and CARD's website states very clearly that "a positive operating return does not necessarily imply profits because other costs, such as plant financing, and returns to capital, **must** be take into

account." (See Ex. B)  Ott's report does not account for financing or returns to capital anywhere in the report.[2]

Ott even creates fictitious numbers for years when the Hungarian plant was not even operational to determine an "average profit" for calculating Catipovic's alleged 10% share.  (See Ex. A, pp. 3-4)  He does this by first providing a table showing "profits" from 2007-2012.  (Id., p. 3)  Despite the fact that Dunafoldvar Ethanol Facility was not operational until 2012, Ott, without explanation or any actual data, lists estimated profits (again using CARD data only that is only representative of an Iowa ethanol facility) from 2010, 2011 and 2012 to determine the "average profits received annually for the trailing three years" and then multiplies that average by four.  (Id., p. 4)  In other words, he uses fictitious data, derived from a report limited to Iowa ethanol plants, to determine the profitability of a Hungarian plant that did not even exist for two of the three years cited.  Ott does not offer any explanation for (1) the basis for his calculation of the profits in 2010 and 2011, years when the plant was not operational or (2) his decision to multiply the total "profits" by four.  Rather than provide any explanation, Ott merely notes:  "As profitability waned, the industry normalized to a 3-5x multiple to trailing earnings.  For the purposes of this calculation, a 4x multiple is appropriate and acceptable."  (Id., p. 3)  Further, Ott's report even admits that the CARD data profitability chart that he created demonstrates the negative effect on profitability caused by "the expiration of federal subsidies."  (Id., p. 4)  The elimination of subsidies provided by the United States government to plant owners in the United States does not relate in any way to Hungary.

Astoundingly, not only does Ott only use data from Iowa-based ethanol plants to determine the "profits" of the Dunafoldvar Ethanol Facility, he compounds his flawed analysis

---

[2]  Defendants have produced documents demonstrating that over $150,000,000 in financing from US and Canadian lenders was utilized to fund development of the Dunafoldvar Ethanol Facility.

even further by concluding that European production is "45.9% more profitable than US production." (Id., p. 5) This wholly speculative conclusion is based only the difference in the average price of ethanol *at the pump* in Europe versus the United States in 2013, converted from U.S. dollars to Euros. (Id.)

Again this methodology is fundamentally flawed and does not survive even mild scrutiny. First, the price of ethanol for a single year, 2013, provides nothing more than a one year snapshot. It certainly cannot be used to postulate profitability over the three year (albeit fictitious) period from 2009 to 2012 to which Ott applies it in his Report.[3] Second, the conclusion that it is more profitable to have a facility in Europe based only on the price of ethanol at the pump does not account for differences in the cost of getting it to the pump, including differences between the United States and Europe in applicable taxes, excises, shipping constraints, infrastructure, subsidies, blending requirements, employment and labor requirements, corn prices, gas and electricity prices, water prices and supply issues, to name just a few. Nevertheless, Ott's flawed conclusion that ethanol production in Europe is 45.9 percent more profitable leads him to increase the value of Catipovic's alleged ten percent share by 45.9 percent. Therefore the fictitious profit of $3,463,102.45 becomes an even more ludicrous $5,269,570.59.

As demonstrated by his own report, Ott's conclusions regarding the Plaintiff's economic damages are deeply flawed, as they are derived from inappropriate supporting data and speculative assumptions, and fail to account for vitally important economic realities. Ott's calculation of the ten percent value of Plaintiff's alleged interest in the Dunafoldvar Ethanol Facility is based entirely on data from CARD which tracks data for a "representative **Iowa** corn

---

[3] Ironically, Ott uses the price of ethanol for 2013 – a year the Report's profit table does not even address.

ethanol plant." His calculations fail to take into account any difference between Eastern Europe and Iowa, except when it suits him to use the European price at the pump of ethanol in 2013. For example, Ott fails to account for critical differences between Iowa and Eastern Europe in the price of corn, transportation costs, and local rules and regulations regarding the production of ethanol, and fails to acknowledge how these regulations impact the overall profitability of an ethanol facility. In sum, Ott's calculations regarding the value of the Dunafoldvar Ethanol Facility are not based on sufficient facts and data. Ott's calculations could only be argued to be accurate if Dunafoldvar, Hungary **was in Iowa**, which obviously it is not. Thus, as explained herein, Ott's calculations fail to meet the requirements of Daubert and Federal Rule of Evidence 702.

Finally, Plaintiff has long been aware of the inaccuracy of Ott's report and has chosen not to supplement or amend it. Defendant's expert Eric Sievers prepared a report specifically addressing the inapplicability of CARD data to postulate profitability of a Hungarian plant. Sievers' expert report is attached hereto as Exhibit C. Sievers explained that there are "vastly divergent cost structures" between Iowa and Hungary which would not be accounted for in the CARD data. (See Ex. C, p. 11) Those divergently different cost structures include (i) excise costs, (ii) transportation costs; (iii) broker fees; (iv) discounts; (v) the price of corn in Hungary versus Chicago prices; (vi) the price of natural gas in Hungary versus New York Mercantile Exchange prices; (vii) the price of electricity in Hungary versus United States; (viii) the Hungarian plant does not denature its ethanol; (ix) European ethanol is made at a different and more expensive specification than United States ethanol; (x) the Hungarian plant has financing costs associated with excise warehouse indemnifications with the Hungarian government; (xi) the Hungarian plant has two to three times as many employees as a similarly sized plant in the

United States; (xii) the Hungarian plant produces no wet DGS, unlike an Iowa plant; (xiii) the Hungarian plant sells the dry DDGS in Hungary, not in the United States; (xiv) the Hungarian plant, per Hungarian law, has to pay a commission on every liter it produces to a certification body; and (xv) the Hungarian plant has to secure European Union Emissions Trading Credits for every ton of carbon dioxide it emits. (Id., p. 13) Sievers also explained that there was over $150,000,000 in outstanding bank loans on the Hungary facility, which required $10,300,000 in principal payments (Id. at 11) and that Ott even used the wrong price for ethanol at the pump Europe. (Id., p. 12) In short, the CARD data relied upon by Ott is simply not applicable to Hungary.

## B. Federal Courts Have Broad Discretion in Determining the Admissibility of Expert Witnesses.

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education **may testify in the form of an opinion or otherwise if;** (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) **the testimony is based on sufficient facts or data**; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702 (emphasis added). Rule 703 considers the bases for an expert's opinions; it provides:

An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703.

The United States Supreme Court interpreted the requirements of Rule 702 in <u>Daubert v.</u> <u>Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). <u>Daubert</u> requires trial courts to act as "gate-keepers" to ensure that expert testimony is reliable. <u>Kumho</u> <u>Tire</u> made clear that the standard mandated by <u>Daubert</u> for scientific opinions applied to all types of expert testimony. An expert opinion must be excluded if the proposed testimony is so fundamentally unsupported that it offers no assistance to the jury. <u>US Salt, Inc. v. Broken</u> <u>Arrow, Inc.</u>, 563 F.3d 687, 91 (8th Cir. 2009).

The Eighth Circuit has noted that testimony is permitted only if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." <u>Synergetics, Inc. v. Hurst</u>, 477 F.3d 949, 955 (8th Cir. 2007). An expert may testify where "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." <u>Id.</u> If an expert fails in these respects, the testimony should be prohibited. <u>Hartley v. Dillard's, Inc.</u>, 310 F.3d 1054, 1061 (8th Cir. 2002) (noting that if the expert's opinions is so fundamentally unsupported that it can offer no assistance to the jury, such testimony must be excluded).

Speculation in the guise of expert testimony is not competent evidence and not admissible. <u>Concord Boat Corp. v. Brusnwick Corp.</u>, 207 F.3d 1039, 1057 (8th Cir. 2000). The important purpose of Federal Rule of Evidence 702 was aptly summarized as follows in <u>Kemp v.</u> <u>Tyson Seafood Group, Inc.</u>, 55 Fed. R. Evid. Serv. 994, 2000 WL 1062105, (D. Minn. 2000):

> Both <u>Daubert</u>, and <u>Kumho</u>, make clear that the day of the expert, who merely opines, and does so on the basis of vague notations of experience, is over. Experts are now held to a level of accountability, that requires factual predicates, in historical fact, or in competent evidence, which allows a factfinder to independently verify the accuracy of the expert's results. Absent such reliable verification, the expert's opinion is not admissible.

9

Id. at *7. Expert testimony that is speculative, unsupported by sufficient facts, or contrary to the facts of the case, is inadmissible. Menz v. New Holland North America, Inc., 507 F.3d 1107, 1114 (8th Cir. 2007); Concord Boat, 207 F.3d at 1057. As set forth herein, under these standards, Ott lacks the qualifications to testify as an expert witness in the areas of foreign business valuations. Further, the opinions contained in his Report are not supported by sufficient facts.

C. **Ott Lacks the Qualifications or Experience to Necessarily to Provide Testimony in this Case.**

Ott's lack of formal training and documented expertise in the area of foreign business valuations undermines his ability to testify as to his supposed damages calculations. In Weitlauf v. Parkway Sch. Dist., 4:07CV407SNL, 2008 WL 544716 (E.D. Mo. Feb. 26, 2008) the court held that the plaintiff's economic damages expert was unreliable even though he was employed as a bank official with a bachelor's degree in finance. Id. at *2. The Court noted that the proffered expert was unqualified because he had never prepared an economic loss valuation, never taught a class on evaluating economic loss, never been hired or testified as an economic loss expert, and had "no formal training in the field of economic losses as alleged in this lawsuit, [and] no experience or practical knowledge that would provide him with some level of expertise in such a field." Id.

Ott does not represent that he is a member of, or is associated with, the Uniform Standards of Professional Appraisal Practice, the standards of the Institute of Business Appraisers, or the standards of the National Association of Certified Valuation Analysts. (See Ex. A) He states in his report he has never testified or been an expert. (Id.) In Rosvold v. L.S.M. Sys. Eng'g, Inc., 2007 WL 3275107 (E.D. Mich. Nov. 6, 2007) the Court disqualified a valuation expert, in part, because he did not belong to the organizations or institutions which govern

valuations, though the expert had personal experience in acquiring companies. Id. at *2. The Court explained:

> [T]he Court does not believe that [the expert] possesses the requisite knowledge, skill, experience, training, or education to opine or testify about such matters as a valuation of [Plaintiff's] six percent share in LSM. Other than his personal experience of "acquiring several companies" and having earned his a master's degree from the Wharton School of Business at the University of Pennsylvania in 1978, [the expert's] resume fails to incorporate any professional experience in valuation analysis. Furthermore, Rosvold has failed to provide the Court with evidence of [the expert's] enrollment or active participation in any of the recognized organizations or institutions that establish the standards or rules to which their members must adhere when preparing a business valuation.

Id. The Court in Rosvold went on to note that this was the expert's first time providing expert testimony and that the expert had never "written any articles or books" relating to the subject matter. Id.; see also Joyce v. Armstrong Teasdale, LLP, 2012 WL 3541825, *2-3 (E.D. Mo. Aug. 15, 2012) (citing Daubert, 509 U.S. at 593-94) (quoting Lauzon v. Senco Products, Inc., 270 F.3d 681, 687 (8th Cir.2001)) ("Daubert's progeny provide additional factors such as: whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case"); Berry v. Crown Equipment Corp., 108 F. Supp. 2d 743, 749 (E.D. Mich. 2000) (stating Rule 702 requires an expert's expertise to relate to the subject matter of the proposed testimony); Police & Fire Retirement Sys. of City of Detroit v. Watkins, 2011 WL 5307594, at *3 (E.D. Mich. 2011) (striking a proposed expert from testifying about carbon credits or asset valuation, noting the expert was an attorney and that did not qualify him to testify regarding matters outside of expertise). Notably, in Watkins, the Court dismissed the argument that an attorney could testify as to valuations and carbon credits by virtue of his "experience as a business person." Id.

Specifically, the Court found "[m]ost CEOs and high level managers deal with valuations, but generally do so with the advice of other experts." Id.

Here, like the experts in Rosvold and Watkins, Ott possesses insufficient qualifications to testify as to business valuations. He admits in his report he has never testified nor has he ever had his deposition taken. His insufficient qualifications are demonstrated by the fact that his report is based on deeply flawed assumptions and data that is not applicable to Hungary. Ott may be an expert in biotechnology or inorganic chemistry, but he has not demonstrated that he has any expertise or ability to provide international business valuations. Given Ott's general lack of education or expertise in this area, his testimony should be disallowed.

### D. Ott's Opinions Regarding the Value of Catipovic's Alleged 10 Percent Interest in the Dunafoldvar Ethanol Facility Fail to Meet the Requirements of Rule 702.

To the extent this Court finds Ott qualified to testify as an expert witness, the opinions set forth in his report are not "based on sufficient facts or data" as required by Rule 702. In fact, Ott's Report concedes:

> [d]etailed financial information from the *actual operating facility has not been received* to date. The projections contained in this report are estimated based on industry standards, modified for specific local conditions, and may change upon receipt of financial information from the actual operating facility.

(Ex. A, p. 1) In other words, the Report is devoid of any actual data or facts from this case. Furthermore, audited financial information for the Dunafoldvar Ethanol Facility was provided to counsel for Plaintiff almost one year ago, and Ott's report was never supplemented.

"Expert testimony is inadmissible if it is speculative, unsupported by sufficient facts, or contrary to the facts of the case." Marmo v. Tyson Fresh Meats, Inc., 457 F.3d 748, 757 (8th Cir. 2006) (applying Nebraska state law) (citing Concord Boat, 207 F.3d 1039, 1056-57 (8th Cir. 2000)) (excluding testimony of a toxicologist proffered to show causation related to an alleged

toxic exposure because the toxicologist failed to obtain sufficient medical history from the plaintiff to exclude or consider any other source of exposure). The entire purpose of expert testimony is to aid the trier of fact; "[e]xpert testimony that is speculative is not competent proof and contributes nothing to a legally sufficient evidentiary basis." J.B. Hunt Transport, Inc. v. Gen. Motors, Corp., 243 F.3d 441, 444 (8th Cir. 2001) (applying Missouri law) (citing Concord Boat, 207 F.3d at 1057) (affirming the district court's exclusion of expert testimony from an accident reconstructionist who conceded that he had insufficient information and that he only had the photographic evidence of the accident which could not support his theory; the Court cited the maxim that opinion evidence that is connected by existing data only by the *ipse dixit* of the expert is insufficient).

The Eighth Circuit regularly refers to the Concord Boat decision when faced with this type of analysis. In Concord Boat, the court looked to the United States Supreme Court's trends, remarking that "[i]n recent years the Supreme Court has put renewed emphasis on the importance of 'fit' of an expert's opinion to the data or facts in the case." 207 F.3d at 1055 (citing Gen. Elect. Co. v. Joiner, 522 U.S. 136, 146 (1997)). "A court must focus on the 'reasonableness of using such an approach, along with [the expert's] particular method of analyzing the data thereby obtained, to draw a conclusion regarding *the particular matter to which the expert testimony was directly relevant.*'" Id. (quoting Kumho, 526 U.S. at 154 (emphasis in original)). Further emphasizing the need for the expert to "fit" the case, the Eighth Circuit, in affirming the district court's decision to disallow an expert, stated:

> Because of the deficiencies in the foundation of the opinion, the expert's resulting conclusions were "mere speculation." **Expert testimony that is speculative is not competent proof and contributes nothing to a legally sufficient evidentiary basis. Expert testimony is useful as a guide to interpreting market facts,** *but it is not a substitute for them.*

Brunswick, 207 F.3d at 1057 (internal citations and quotations omitted)(emphasis added).

Ott's use of data from Iowa-based ethanol facilities and fictitious "profitability" numbers to value the Dunafoldvar Ethanol Facility constitutes unsupported speculation that cannot be reconciled with any recognized valuation methodology, as detailed above. The court stated in Estate of Groff v. Aquila, Inc., 4:05-CV-0250-JAJ, 2007 WL 4644707 (S.D. Iowa Sept. 28, 2007):

> Daubert's admissibility standard requires [the expert] to do more than support his position with an educated guess based on general principles; he needs objective evidence to support his theories. The Eighth Circuit recently confirmed this when it stated, "[w]here 'opinion evidence . . . is connected to existing data only by the ipse dixit of the expert,' a district court 'may conclude that there is simply too great an analytical gap between the data and the opinion proffered"

Id. (citing Pro Service Auto., L.L.C. v. Lenan Corp., 469 F.3d 1210 (8th Cir. 2006)). In Estate of Groff, the court concluded that the expert had attempted to bridge the gap with "speculation and beliefs" rather than evidence and therefore excluded the opinion testimony. The same result is required here. There is no evidence to bridge the gap between the "data" and Ott's opinions. "[N]othing in… Daubert… requires a district court to admit opinion evidence that is connected to existing data only be the ipse dixit of the expert." Children's Broad. Corp. v. Walt Disney Co., 245 F.3d 1008, 1018 (8th Cir. 2001). Because they lack the "reliable foundation" required by Daubert, Ott's opinions regarding the value of the Dunafoldvar Ethanol Facility should be excluded from the evidence presented to the jury.

It is clear that Ott's analysis of the ten percent value of the Hungarian facility does not satisfy these requirements and should be excluded. Ott's opinions are not based on any treatises, peer-reviewed articles, scholarly works or similar sources that analyze how to calculate the value of an ethanol facility in Europe. Instead, Ott's opinions are based on vague notions of experience, speculation and data which is clearly inapplicable to Hungary. While Ott does state

14

that his calculations are based on data from CARD, his decision to rely on CARD is flawed – as confirmed by CARD's own disclaimers on its website. As noted above, CARD analyzes operating margins for ethanol facilities in Iowa. In his Report, Ott fails to recognize any differences between a project developed in Iowa and the first project ever constructed in Eastern Europe. In fact, the only difference Ott recognizes is the conversion from U.S. dollars to Euros and his unsupported conclusion that based on European prices, the value of a European ethanol facility must be increased 45 percent.[4]

Ott's calculation on lost profits of the facility to which Catipovic allegedly has a right are based upon fictional numbers from years when the plant itself was not even completed, much less operational. Ott fails to make any analysis of the additional and different costs associated with constructing an ethanol facility in Eastern Europe, increased labor costs or tax and regulatory differences, and countless other factors. Given the vast differences between operating an ethanol facility in Iowa and operating an ethanol facility in Hungary, Ott's Report is not based on "sufficient facts" as required by Rule 702. As noted above, the Eighth Circuit scrutinizes the facts underlying an expert's opinions to ensure that the expert "fits" with the case at bar. Here, Ott simply does not fit because he utilized speculative numbers to arrive at his conclusions. Ott has no basis in fact for his analysis and his deeply flawed speculation is not a substitute for facts, thus, his opinions must be excluded.

---

[4] Ott's 45 percent calculation is further suspect given that he bases his conclusion on the increased value of European facility on the European ethanol <u>sales</u>. Without any consideration for the innumerable differences between sales and profits, Ott uses the sales data to determine that European <u>profits</u> are 45 percent greater than profits for an Iowa facility. Any qualified business valuation expert would understand the difference between sales and net profits, thus Ott's 45 percent increase is unsupported by any actual data.

### E. Ott's Opinions Regarding Catipovic's Unjust Enrichment Damages Fail to Meet the Requirements of Rule 702.

In his Report, Ott places the value of Catipovic's assistance to Turley at $2 million. (See Ex. A, pp. 1, 7) Ott fails to set forth sufficient facts or data supporting his conclusion that the value of Catipovic's contributions is $2 million. Ott does note that Iowa ethanol plant developers have been paid anywhere from $300,000 to $1.5 million for their development efforts. <u>See</u> Report at p. 6. However, Ott does not explain the work actually done by these Iowa developers or compare that work to anything actually done by Catipovic. Further, Ott does not mention that any "assistance" Catipovic may have offered related specifically to the development of an ethanol facility in Croatia. To this day, no such facility is operational.

As appears from the face of Ott's Report, his opinions regarding the value of Catipovic's development work is wholly unsupported by any analysis, data or facts as required by Rule 702. Ott's valuation of $2 million appears to be magically plucked from the air. Further, the wide range Ott states has been paid to developers for Iowa facilities demonstrates how speculative his damages calculations are; such speculative testimony must be barred under Rule 702 and the cases discussed *supra*.

In conclusion, given the lack of *any* facts supporting Ott's $2 million valuation, there is no evidence to bridge the gap between the "data" and Ott's opinions regarding Ott's damages for the Plaintiff's unjust enrichment claim. Thus, Ott's opinions regarding the value of Catipovic's unjust enrichment claim must be excluded.

### F. Ott's Testimony Must be Limited to the Opinions Contained in his Report.

To the extent the Court allows Ott to testify, or to attempt to revise his report to offer valuations based on European data or otherwise supplement or add to his report, Federal Rule of Civil Procedure 26(a)(2) bars any late supplementation. Rule 26 provides that a party must

16

disclose the identity of any expert witness it may use at trial to present expert testimony. The rule goes on to state that this disclosure must be accompanied by a written report and contain the following:

> (i) **a complete statement of all opinions** the witness will express and the basis and reasons for them;
> (ii) the data or other information considered by the witness in forming them.

Fed. R. Civ. P. 26(a)(2)(B) (emphasis added). A party also has the obligation to supplement these disclosures when required. Fed. R. Civ. P. 26(a)(2)(D). Rule 37(c) provides that "if a party fails to provide information . . . as required by Rule 26(a) . . . the party is not allowed to use that information" at a trial, unless such failure was substantially justified or is harmless. See Fed R. Civ. P. 37(c).

To the extent that Ott attempts to offer testimony regarding opinions that were not disclosed in his expert report, such testimony or opinions not contained in his report should be prohibited as any untimely supplementation would be violative of Fed. R. Civ. P. 26(a)(2) and 37(c). Rules 26(a)(2) and 37(c) require disclosure of "a complete statement of all opinions" and permits exclusion of information not provided in compliance with Rule 26(a).

In <u>Sylla-Sawdon v. Uniroyal Goodrich Tire Co.</u> the Eighth Circuit affirmed the district court's limiting testimony to the limited content of the expert's affidavit "and nothing else." <u>Sylla-Sawdon</u>, 47 F.3d 277, 283 (8th Cir. 1995). In <u>Sylla-Sawdon</u>, the defendant filed a motion in limine to exclude the expert's testimony. <u>Id.</u> The Eighth Circuit described the expert report as "cursory" and noted that Federal Rules of Civil Procedure 16(f) and 37 "authorize district courts to prohibit the admission of evidence proffered by the disobedient party." <u>Id.</u> at 284. The court pointed out that the rationale behind the adoption of Rule 26 was "the elimination of unfair surprise to the opposing party and the conservation of resources." <u>Id.</u> The Eighth Circuit ruled

that "the district court did not abuse its discretion in limiting [the expert's] testimony to the content of his affidavit as a sanction for his failure to comply" with the scheduling order requiring a "complete statement of all opinions to be expressed, and the basis and reasons therefor." Id. Thus, any attempt by Ott to supplement or revise his opinions must be barred.

In conclusion, as set forth herein, any testimony from Ott should be barred because he lacks the qualifications of experience necessary to opine on the value or profits of a European ethanol facility. Even if Ott did have the requisite qualifications to testify in the area of business valuations, the conclusions in Ott's Report regarding Catipovic's damages are not supported by sufficient facts or data as required by Rule 702. Finally, to the extent this Court does permit Ott to offer any testimony, his opinions must be limited to those set forth in his Report.

## SECOND MOTION IN LIMINE

## SPECULATIVE LOST PROFITS DAMAGES

Ott's testimony, regarding the supposed profitability of the Dunafoldvar Ethanol Facility should also be excluded under Iowa's "new business rule" which makes any testimony related to future lost profits by Ott inadmissible. It should also exclude any testimony by others related to the Dunafoldvar Ethanol Facility's future profits, or about how profitable the facility in Osijek, Croatia would have been, if it were built.

Iowa recognizes the "new business rule," which provides that lost profits from a new business are "generally too speculative to be recoverable in the absence of detailed testimony from a well-qualified expert[5]." Doctor John's, Inc. v. City of Sioux City, IA, 438 F. Supp. 2d 1005, 1038 (N.D. Iowa 2006)(citing Harsha v. State Savings Bank, 346 N.W.2d 791, 797 (Iowa 1984)). "The rationale underlying the rule is that there is no available data of past business from which anticipated profits could be established." Hog Slat, Inc. v. Ebert, 104 F. Supp. 2d 1112,

---

[5] As noted in Turley's First Motion in Limine, Ott lacks the qualifications to provide such testimony.

1120 (N.D. Iowa 2000) (citing Employee Benefits Plus, Inc. v. Des Moines General Hospital, 535 N.W.2d 149, 156 (Iowa App. 1995)).

The present case is similar to McNeal v. SDG Macerich Properties, L.P., C 07-4015 MWB, 2008 WL 2691047 (N.D. Iowa July 1, 2008). In that case, this Court held that under the "new business rule" evidence of future lost profits for the plaintiff-business was too speculative and should be excluded. Id. at *13-17. The Court held that the plaintiff seeking to admit evidence of lost future profit:

> failed to identify factual data furnishing a basis for probable loss of profits from which a jury could determine the weight to be given to that evidence. … To put it another way, [the plaintiff] simply has not identified evidence from which the question of a prospective loss of profits can be determined with reasonable certainty. **[The plaintiff] has not identified any closely associated business, either a predecessor, as in Independent Business, or an analogous one, as in Hog Slat, from which profits of McNeal's "lost" Christian-themed clothing store could be extrapolated.** … Indeed, the lost profits evidence identified here is even further removed from the circumstances in either Independent Business or Hog Slat, and thus, **even more speculative, because [the plaintiff] is seeking future lost profits for a Christian-themed clothing business that she never operated at all, not just future lost profits for the kiosk business that she did operate**. See Independent Business, 127 F.3d at 704 (the successor business, for which lost profits damages were sought, had actually operated); Hog Slat, Inc., 104 F.Supp.2d at 1120 (the claimant business had operated long enough to demonstrate that it was comparable to the comparator business). Thus, evidence of [the plaintiff's] lost profits for the business she opened or her "lost opportunity" damages for inability to open a different business is barred by the "new business rule."

Id. (emphasis added). Similarly, in this case, neither Catipovic nor his expert can offer any testimony regarding the profits from a predecessor or analogous business because no such business exists. The Dunafoldvar Ethanol Facility is the first of its kind in Eastern Europe. The Osijek facility was never built, and was fundamentally different than the Hungarian project. Further, as in McNeal, Catipovic is seeking lost profits for an ethanol facility where he has no experience operating such a business.

In sum, any evidence regarding potential future profits for the Dunafoldvar Ethanol Facility or the non-existent Osijek facility is too speculative. To allow any arguments by counsel or testimony by witnesses on this point would result in severe prejudice to Turley. Therefore, any such evidence offered at trial should be excluded.

## THIRD MOTION IN LIMINE

## EVIDENCE RELATED TO FERGUS MURPHY'S TRAVEL RESTRICTIONS

As noted in Turley's Motion to Permit Testimony via Video Conferencing, Turley's witness Fergus Murphy lives in Europe and has had difficulties in obtaining a visa to travel to the United States. See Motion; Document No. 126. Murphy is an engineer who formally worked as a consultant for Turley, and is now the Chief Technology Officer for Ethanol Europe Renewables, Ltd. Murphy lives in Budapest, Hungary and was denied a visa to travel to the United States on two previous occasions. The reasons why Murphy's travel visa has been denied on the last two attempts are unclear, despite efforts by Murphy to determine the cause. Thus, Turley sought approval for Murphy to testify via video conferencing, and this Court granted such approval on February 27, 2014.

Turley seeks to exclude any mention or testimony related to Murphy's inability to obtain a travel visa. Murphy's inability to travel to the United States is not relevant under Federal Rule of Evidence 402. To the extent there is any limited relevance, its probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues and wasting time under Rule 403. See Fed. R. Evid. 403. Further, because Turley does not know why his visa was denied, any testimony regarding his travel restrictions would be wholly speculative.

While there does not appear to be any reported case law on point, this situation is, in some ways, broadly analogous to the admissibility of past criminal convictions. This Court has

previously barred testimony regarding past criminal convictions in <u>United States v. Roberson</u>, CR 06-3010 MWB, 2006 WL 2089944 (N.D. Iowa July 25, 2006). In <u>Roberson</u>, the Court barred testimony regarding a witnesses' past conviction for driving while barred. The Court explained that "pursuant to Rule 403, the potential for prejudice from admission of a conviction for driving while barred outweighs its probative value in this case. Indeed, [the defendant] makes no argument that the conviction is probative of *anything,* apart from his mistaken argument that it is probative of dishonesty." <u>Id.</u> at *7 (emphasis in original). The Court agreed that "evidence of such conviction would be unfairly prejudicial, because it would serve no purpose other than to suggest that the witness is a bad person." <u>Id.</u>

While this is not a situation where Murphy has been convicted of a crime, any evidence of his inability to travel to the United States would serve no purpose other than to suggest he is a bad person. There is no evidence that the information would be probative of his honesty. There is no evidence of anything – which is why it would present the dangerous possibility of unfairly prejudicing the jury against Mr. Murphy. Because Mr. Murphy is not aware of the reasons why his last two requests for travel visas have been denied, Defendants would be unable to rehabilitate him from the prejudicial impact of the information. Thus, any evidence or testimony regarding Murphy's travel restrictions must be barred under Rule 402 and 403.

## FOURTH MOTION IN LIMINE

### ANY REFERENCE TO UNPLEADED CLAIMS REGARDING ALLEGED FRAUD OR ALLEGED CONSPIRACY WITH FAGEN DEFENDANTS

Plaintiff has, on two occasions, moved the Court to amend the pleadings to assert a claim of fraud against Turley. On both occasions the Court has denied the motions to amend. Plaintiff has also made allegations of conspiracy between Turley and the Fagen Defendants related to an intent to circumvent or defraud Plaintiff, which is also not a pleaded claim before the Court.

Any references to fraud, or allegations of conspiracy should be excluded from trial pursuant to Federal Rule of Evidence 402 and 403, as they would undoubtedly be irrelevant and unfairly prejudicial to Defendant Turley.

**FIFTH MOTION IN LIMINE**

**EVIDENCE OF DAMAGES NOT INCLUDED IN PLAINTIFF'S
ANSWERS TO INTERROGATORIES**

Catipovic should be prohibited from claiming any different or additional damages at trial than those that he has been previously disclosed in his Answers to Interrogatories. In Interrogatory No. 21 Turley asked Catipovic to "[i]dentify and itemize with specificity each and every element of damage you allege you are entitled to recover from Defendant Turley in this matter for Count I: Breach of Contract…." See Catipovic's Answers to Turley's Second Set of Interrogatories attached hereto as Exhibit D and incorporated herein by this reference. In Interrogatory No. 22 Turley asked Catipovic to "[i]dentify and itemize with specificity each and every element of damage you allege you are entitled to recover from Defendant Turley in this matter for Count II: Unjust Enrichment…." (Ex. D) In response to Interrogatories Nos. 21 and 22, Catipovic stated: "Please see Plaintiff's Initial Disclosures as well as the expert report of Michael Ott. Plaintiff is not yet in a position to completely itemize his damages as Defendant has not produced all information and documentation necessary for the calculation of said damages. This answer will be supplemented as discovery continues." (Id.) Similarly, in Catipovic's Rule 26 Initial Disclosures he states that a "computation of damages in not possible at this point." See Catipovic's Initial Disclosures attached hereto as Exhibit E and incorporated herein by this reference. Catipovic has failed to supplement his responses to Catipovic's discovery requests or his Initial Disclosures related to damages. Accordingly, Turley seeks an

order barring Catipovic from introducing any evidence or testimony related to damages that Catipovic did not previously disclose in discovery.

Federal Rule of Civil Procedure 26(a)(1) provides in pertinent part:

> [A] party must, without awaiting a discovery request, provide to other parties:
> …
> (iii) a computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered.

<u>See</u> Fed. R. Civ. P. 26(a)(1). Neither Catipovic's Initial Disclosures, nor his discovery responses, provide a detailed computation of his damages. Catipovic's Answers to Interrogatories do reference Ott's Report, but Catipovic has failed to supplement his discovery to provide any additional or further itemization of his damages. Federal Rule of Civil Procedure 37(c) states that when a party "fails to provide information … as required by Rule 26(a) … the party is not allowed to use that information… to supply evidence on a motion, at a hearing, or at a trial." <u>See</u> Fed R. Civ. Pro. 37(c)(1). The Eighth Circuit affirmed the trial court's exclusion of damages evidence and theories where the party failed to timely disclose such evidence or theories in <u>ELCA Enters., Inc. v. Sisco Equip. Rental & Sales, Inc.</u> 53 F.3d 186, 190 (8th Cir. 1995).

Here, in accordance with Rules 26(a) and 37(c) any damages evidence not specifically disclosed by Catipovic in his Answers to Interrogatories or Initial Disclosures must be excluded. Accordingly, Turley seeks an Order specifically barring Catipovic from introducing any previously undisclosed damages evidence or testimony.

## SIXTH MOTION IN LIMINE

## RELATIVE WEALTH OF THE PARTIES

Catipovic is expected to attempt to seek to introduce evidence relating to Turley's financial condition or regarding the relative wealth of the parties. Such evidence lacks probative value and is irrelevant, immaterial and inadmissible under Federal Rule of Evidence 402. Injecting a defendant's wealth into the consideration of liability and the award of compensatory damages violates fundamental fairness to defendants, as well as common law safeguards. See State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 427 (2003) ("[t]he wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award" and a defendant's finances "bear no relation to the award's reasonableness or proportionality to the harm."). Further, a plaintiff may not "enjoy a windfall because they have the good fortune to have a defendant with a deep pocket." Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 22 (1991). The Eighth Circuit has specifically noted that evidence of a party's wealth is "totally irrelevant to the issue of compensatory damages." Burke v. Deere & Co., 6 F.3d 497, 513 (8th Cir. 1993), citing Feld v. Merriam and Wynne, Inc., 506 Pa. 383, 485 A.2d 742, 748 (1984) (stating that: "A jury may not consider a defendant's wealth in setting compensatory damages. It is '"improper, irrelevant, prejudicial, and clearly beyond the legally established boundaries").

Catipovic's brief in resistance to Defendants' motion for summary judgment provides the Court an advance preview of some of the prejudicial terms Catipovic might attempt to improperly insert at trial. His resistance referred to Turley as a "billionaire" and a "Wall-Street type" and said he was "flush with cash from serial investments in Ireland and Poland." He referred to Ron Fagen as the "King of Corn." These are factually inaccurate, derogatory and injurious comments which would be highly prejudicial to Defendants and should be excluded

24

from trial. In sum, any evidence of Turley's wealth or the relative wealth of the parties will serve no purpose other than to potentially capitalize on bias of the jury. Catipovic should not be allowed to offer any testimony or evidence regarding the comparative wealth of the parties and thereby divert the jury's attention from the actual issues in this case. Accordingly, all such evidence should be excluded.

## SEVENTH MOTION IN LIMINE

## SETTLEMENT NEGOTIATIONS AND OFFERS TO COMPROMISE

Prior to trial the parties engaged in settlement negotiations. Pursuant to Federal Rule of Evidence 408, Turley seeks to any evidence, testimony, or argument related to the parties' previous, unsuccessful settlement discussions. Federal Rule of Evidence 408 states:

> (a) Prohibited Uses. Evidence of the following is not admissible--on behalf of any party--either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:
> (1) furnishing, promising, or offering--or accepting, promising to accept, or offering to accept--a valuable consideration in compromising or attempting to compromise the claim; and
> (2) conduct or a statement made during compromise negotiations about the claim--except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.

Fed. R. Evid. 408. See also, Niver v. Travelers Indem. Co. of Illinois, 433 F. Supp. 2d 968, 993-94 (N.D. Iowa 2006) (granting a motion in limine barring any discussion regarding offers to compromise or settle). Thus, in accordance with Rule 408, Turley seeks an order barring any testimony, arguments or evidence related to the parties' pre-trial settlement discussions.

## EIGHTH MOTION IN LIMINE

## IRRELEVANT CORRESPONDENCE TO WALT WENDLAND

It is anticipated that Catipovic may seek introduce into evidence at trial a letter from Defendant Turley to Walt Wendland dated October 24, 2012, or to elicit testimony at trial

regarding the letter. A copy of the referenced letter is attached hereto as Exhibit F for the Court's reference. (WW007526-7527) Plaintiff previously submitted the October 24, 2012 letter in support of his resistance to Defendant Turley's Motion for Summary Judgment. Specifically, Plaintiff argued that:

> Not only did Turley work to deprive Catipovic of his brainchild, but he went to extreme lengths to ensure injury to the Plaintiff. Wendland continued to be involved in Etanol Osijek after Fagen left the project to work exclusively with Turley. Wendland was threatened by Turley with legal action and court sanctions by Defendants if he supported Plaintiff in the lawsuit and Fagen was complicit in these threats. The threats made to Wendland after discovery was served in this matter (in October 2012) are emblematic of Turley's unwillingness to be held accountable for his conduct.

(Doc. No. 100-1, pp. 44-45, citing October 24, 2012 letter).

The October 24, 2012 letter should be excluded as irrelevant under Federal Rule of Evidence 402, as it does not have any tendency to make a fact of consequence in determining Plaintiff's claims for breach of contract or unjust enrichment more or less probable. <u>See</u> Fed. R. Evid. 402. To the extent the letter can be deemed to have any limited relevance, its probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, and wasting time under Rule 403. <u>See</u> Fed. R. Evid. 403.

The October 24, 2012 letter should also be excluded as improper character evidence pursuant to Federal Rules of Evidence 404 and 608. Rule 404 provides that "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404. Rule 608(b) relevantly provides:

> **(b) Specific instances of conduct.** Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross examination, allow the m to be inquired into if they are probative of the character for truthfulness or untruthfulness of:

(1) the witness; or
(2) another witness whose character the witness being cross examined has testified about.

As explained by this court in a prior case, "[t]he focus of Rule 608 is an attack on a witness's general character. . .More specifically 'Rule 608(b) applies when a party attempts to introduce evidence of prior conduct of a witness that standing alone tends to attack or support the witnesses's general character for truthfulness.'" McNeal v. SDG Macerich Properties, L.P., 2008 WL 2691047 at *6 (N.D. Iowa July 1, 2008)(citing United States v. Bolzer, 367 F.3d 1032, 1039 (8th Cir. 2004)). Pursuant to the clear wording of Rule 608, Plaintiff should not be permitted to introduce the October 24, 2012 letter to attack Defendant Turley's character for truthfulness. Any inquiry regarding the October 24, 2012 letter on cross examination should also be prohibited, as any probative value such inquiry would have would be outweighed by the potential for confusion of the issues, prejudice, and waste of time. See Fed. R. Evid. 403; McNeal, 2008 WL 2691047 at *6 (granting motion in limine pursuant to Rule 608).

## CONCLUSION

For the reasons argued herein and based upon applicable authority, Defendant Mark Turley respectfully requests that the Court grant his Motions in Limine and enter an order in limine prohibiting Plaintiff Branimir Catipovic from introducing into evidence or in the presence of the jury at any time: (1) any testimony from Plaintiff's expert Michael Ott; (2) any speculative evidence or testimony regarding future lost profits; (3) any evidence or testimony regarding Fergus Murphy's travel restrictions; (4) any reference to unpleaded claims regarding alleged fraud or alleged conspiracy of Defendant Turley with the Fagen Defendants; (5) any evidence of damages not disclosed by Catipovic in his answers to interrogatories; (6) any evidence regarding the relative wealth of the parties; (7) any evidence of pre-trial settlement

discussions; and (8) any evidence regarding correspondence between Walt Wendland and Mark Turley dated October 24, 2012.

Defendant Turley notes that exhibit lists are due to be served on opposing counsel on the same date this Motion in Limine is due to be filed with the Court, with objections to any exhibits due with the proposed Final Pretrial Order. Defendant Turley hereby incorporates his objections to be offered by Plaintiff into his Motion in Limine.

/s/ Michael C. Richards
Sharon K. Malheiro AT0004936
Michael C. Richards AT0010828
William E. Hanigan AT0003284
Elizabeth R. Meyer AT0010139
DAVIS, BROWN, KOEHN, SHORS
 & ROBERTS, P.C.
The Davis Brown Tower
215 10th Street, Ste. 1300
Des Moines, Iowa 50309
Telephone: (515) 288-2500
Facsimile: (515) 243-0654
Email: sharonmalheiro@davisbrownlaw.com
Email: mikerichards@davisbrownlaw.com
Email: billhanigan@davisbrownlaw.com
Email: elizabethmeyer@davisbrownlaw.com

ATTORNEYS FOR DEFENDANT
MARK TURLEY

Copy to:

Kevin J. Visser
Paul D. Gomez
Simmons Perrine Moyer Bergman PLC
115 Third Street, SE, Suite 1200
Cedar Rapids, Iowa 52401

ATTORNEYS FOR PLAINTIFF
BRANIMIR CATIPOVIC


Connie M. Alt
Dana L. Oxley
Shuttleworth & Ingersoll, PLC
115 3rd Street SE, Suite 500
Cedar Rapids, Iowa 52401

ATTORNEY FOR DEFENDANTS
ROLAND FAGEN AND FAGEN, INC.

**PROOF OF SERVICE**

The undersigned certifies that the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on **February 28, 2014** by:

☐ US Mail            ☐ FAX
☐ Hand Delivered     ☐ Overnight Courier
☐ Federal Express     ☒ Other: CM-ECF Filing

Signature: /s/Michael C. Richards _____

29